FILED

APR 2 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1
2          Phone:
3
4
5    Case #: 1:06-mj-00182-DAR                April 18, 2007
6
7    Honorable John M. Facciola (Phone: 202-354-3130)
8    U.S. District Court, Courtroom 2
9    333 Constitution Ave., N.W.
10   Washington, D. C. 20001
11   Phone: 202-354-3064 (Ms. Tiffany Reed)
12
13                        Re: Petition to be amicus
14   Dear Honorable Facciola:
15

*LET THIS BE FILED*

Deborah A. Robinson
United States Magistrate Judge

16   | I.   Government's allegation. |

17        1.   Document 1-1: "CRIMINAL COMPLAINT … On or about

18   April   20,   2006   …   defendant(s)   did,   knowingly   and

19   willfully intimidate, coerce, threaten, or harass … [Mr.]

20   Hu, …."

21

22   | II.   Perkins: Definition of **willfulness** (p. 1, line 19). |

23        2.   Black's  Law  Dictionary:  "**willful** … 'The  word

24   'wilful'  or  'wilfully'  when  used  in  the  definition  of  a

25   crime,  it  has  been  said  time  and  again,  means  only

26   intentionally  or  purposely  as  distinguished  from  acci-

27   dentally  or  negligently  and  does  not  require  any  actual

1

1    impropriety; while on the other hand it has been stated

2    with equal repetition and insistence that the requirement

3    added by such a word is not satisfied unless there is a

4    bad purpose or evil intent.' Rollin M. Perkins & Ronald N.

5    Boyce, *Criminal Law* 875-76 (3d ed. 1982)."

6

7    | III.  Government has failed to show that Ms. Wang's

8    | "purpose" (p. 1, line 26) was to harass Mr. Hu.

9        3.  Document 3, filed on 4/21/2006: "Ms. Wang then

10   began to yell … '… President Bush, stop him [Hu Jin-tao]

11   from persecuting Falun Gong.'"  It showed that Ms. Wang's

12   legitimate <u>purpose</u> was to stop Mr. Hu from persecuting

13   Falun Gong.

14       4.  57 NY Jur 2d (1986), EVIDENCE AND WITNESSES, §

15   164, P. 376: "The test is according to 'who has the

16   affirmative'; the burden is laid, not according to who

17   will be successful,[94] but who will lose[95] if no evidence

18   at all is introduced."

---

[94] *Anderson v Material Co-ordinating Agency, Inc.* (1946, Sup) 63 NYS2d 324, 11
CCH LC ¶ 63123; ….

1    5.    Government, "who has the [implicit] affirmative"

2    (p. 2, lines 15, 16) of that Ms. Wang's purpose was to

3    harass Mr. Hu, has failed to show the said purpose.

4

5    | IV.  Black's: Definition of **harassment** (p. 1, line 19). |

6    6.    Black's Law Dictionary: "harassment … Words, cond‹

7    uct, or <u>actions</u> (usu. repeated or persistent) that, being

8    directed at a specific person, <u>annoys</u>, <u>alarms</u>, or causes

9    substantial emotional <u>distress</u> in that person and serves

10   no legitimate <u>purpose</u>. …"

11

12   | V.   Government has failed to show that Mr. Hu was |
13   | "annoyed," "alarm[ed]," or "distress[ed]." (¶ 6). |

14

15   | VI.   *Martin:* Government's malice |

16   7.    59 New York Jurisprudence 2d (2005), False Im-

17   prisonment, § 76, p. 334: "<u>Malice</u> may be inferred from an

18   absence of <u>probable cause</u> for prosecution of the original

---

[95] *John Turl's Sons, Inc. v Williams Engineering & Contract-ing Co.* (1910) 136 AD 710, 121 NYS 4768; *Anderson v Material Co-ordinating Agency, Inc.* (1946, Sup) 63 NYS2d 324, 11 CCH LC ¶ 63123。

1  proceeding[1]."

2

3        VII.  *Evening Post:* "Punitive

4        damages are … public policy."

5      8.  *Bixby v. Dunlap* (3/31/1876), 56 N. H. 456, at 456:

6  "When the element of malice enters into the wrong, a more

7  liberal rule of damages prevails, …."

8      9.  *Reynolds v. Pegler,* D.C., 123 F.Supp. 36, at 38:

9  "Punitive damages are allowed on the ground of <u>public</u>

10 <u>policy</u> and not because the plaintiff has suffered any

11 monetary damages for which he is entitled to reim-

12 bursement; the award goes to him simply because it is

13 assessed in his particular suit.[8]"

14

15 VIII.  *Reynold:* "Unless … sufficient substance" of $1.6

16 billion to "smart" Government, it is unable to "deter[]

17 [Government] from a repetition of [false imprisonment]."

18     10.  *Reynolds v. Pegler* (1954), 123 F.Supp. 36, pp 41,

---

[1] *Martin v. City of Albany,* 42 N.Y.2d 13, 396 N.Y.S.2d 612,  364 N.E.2d 1304
(1977); ….

[8] *New York Evening Post Co. v. Chaloner,* 2 Cir., 265 F. 204, 220."

1   42: "Unless it is of sufficient substance to 'smart,' the

2   offender in effect purchases a right to libel another for

3   a price which may have little or no effect upon him.

4   Indeed, in such a situation a defendant, instead of being

5   deterred   41 ⊥ 42   from a repetition of his offense, may

6   be encouraged to renew his assault."

7

8         IX.   *Estate:* Ms. Wang's innocence has
9               escaped Your Honor's consideration.

10      11.   3B Corpus Juris Secundum, p. 170: "As an amicus

11  curiae is not a party to the action,[6] the term implies

12  the friendly intervention of counsel to call the court's

13  attention to a legal matter which has escaped or might

14  escape the court's consideration.[7]"

15      12.   6/22/2006 The Epoch Times: "Wang Wen-yi ex-

16  pressed: '… I hope that the case be genuinely completely

17  withdrawn without any condition." **(Exhibit A)**.

---

[6] U.S. — *Miller-Wohl Co., Inc. v. Commissioner of Labor and Industry State of Mant.*, 694 F.2d 203 (9th Cir. 1982).

[7] S.D. — *In re Ohlhauser's Estate,* 78 S.D. 319, 101 N.W.2d 827 (1960).

1 | X.   *Matthews:* "[P]ublic concern …
2 |                  great liberality in granting."

3.   13.   3B Corpus Juris Secundum, p. 172: "Where matters

4  of <u>public concern</u> are involved, the courts exercise <u>great</u>

5  <u>liberality</u> in granting leave to appear.[8]"

6.   14.   Mr. Hu Jin-tao's persecuting Falun Gong practi-

7  tioners is a matter of public concern, wherefore, per

8  *Matthews,* it is respectfully requested that an order

9  granting Li-jun to be an amicus be issued.

10  Dated: Flushing, New York

11        April 18, 2007

12                              Respectfully submitted,
13
14
15
16                                          Li-jun

17  Subscribed and sworn to before me

18  this __10th__ day of April, 2007.

JENNY H. CHAO
Notary Public, State of New York
No. 01CH6074371
Qualified in Queens County
Commission Expires May 13, 2010

---

[8] Ohio — *Matthews v. Ingleside Hospital, Inc.,* 21 Ohio Misc. 116, 49 Ohio Op. 2d 382, 50 Ohio Op. 2d 228, 254 N.E.2d 923 (C.P. 1969).

6

```
1   CC: David W. Bos, Esq.
2       Attorney for Wang Wen-yi（王文怡的律师）
3       625 Indiana Avenue, N.W., Suite 550
4       Washington, DC 20004
5       Phone: 202-208-7500, Fax: 202-208-7515
6                              6:50 AM 4/19/07
7       Michael Truscott, Esq.
8       Prosecutor
9       U.S. Attorney's Office
10      Federal Major Crimes Section
11      555 4ᵗʰ Street, N.W., Room 4237
12      Washington, DC 20530
13      Phone: 202-514-7533, Fax: 202-353-9414
14                             7:00 AM 4/19/07
15
16
17
18
19
20  Attachment:
21  19-page reason of Ye-ning, Esq.（葉寧律師）. (Phone:
22
23       (Exhibit B).
         7:14 AM 4/19/07
```





7

Exhibit A

**會版 The Epoch Times 大紀元時報**

**對王文怡起訴**

**美法庭撤銷**

二〇〇六年六月二十二日 A2版

【大紀元綜合報導】4 月 20 號，在白宮為來訪的胡錦濤舉行歡迎儀式時，在場報導的大紀元時報記者王文怡曾經高喊，要求胡錦濤及布什總統制止中共當局迫害法輪功學員甚至活體摘取法輪功學員器官的行為。美國警方隨即以騷擾國家領導人的罪名對王文怡提出起訴。

美國之音報導，這個案子經過三次審理延期，受理此案的華盛頓市法庭 6 月 21 號在檢方與被告達成一致意見的情況下決定對王文怡撤銷起訴，理由是證據不足。但附加條件是王文怡在今後一年內即在 2007 年 4 月 20 號前不得有同樣的行動。

- 王文怡表示：「美國政府做了一些調查，也知道一些情況吧，關於活體摘除的情形。它是希望庭外和解，但是我不覺得我做
- 了任何錯，所以我希望真正無條件的完全撤
- 案。」

The Epoch Times 6/22/2006, A2: "王文怡表示：'… 我不覺得我做了任何錯，所以我希望真正無條件的完全撤案。'"    "Wang Wen-yi expressed: '… I don't think that I did any mistake, therefore I hope that the case be genuinely completely withdrawn without any condition.'"

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America

     Plaintiff

             v.               Case Number: 06-182MJ-01

Wenyi WANG              The Hon. Alan Kay

     Defendant

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## AMENDED BRIEF OF FREE CHNA MOVEMENT FOUNDATION AS AMI*CUS CURIAE* IN SUPPORT OF DEFENDANT DR. WENYI WANG

The undersigned, Ning Ye, Esq., an attorney in good standing of this Honorable Court, and Chairman of Free China Movement Foundation, acting as Amicus Curiae in the above-captioned case, respectfully submit this brief *amicus curiae* because the outcome of this instant case concerns the noble cause of human rights in such oppressed nation as China, where millions of killed and imprisoned, voiceless, but innocent souls, should have their voice be heard in the land of democracy, in this Honorable Court through certain legitimate channels, therefore, the instant case deeply concerns the vital interests of Free China Movement, as a concerned party.  Consequently, it appears appropriate for the Free China Movement to act as an amicus in this instant case to present this amicus curiae, say, friend of court.  As procedural posture, this Amended Briefing is respectfully submitted to this Honorable court pursuant to Rule 29. Federal Rules of Appellate Procedure (FRAP), also Rule 37(1), Rules of the Supreme Court of the U.S.

     The undersigned Amicus believes that a prompt, decent, and good-to-all, instead of a deferred, exit from this on-going criminal prosecution will be in the best interests of all parties involved in this instant case, therefore, it will be a choice of wisdom, serving the best interests of justice, to accept this Amicus Curiae, to avoid further disgrace arising out of this instant case.

On April 20, 2006, the Government of the United States arrested the Defendant and charged Defendant for criminal offense under 18 USC 112(b)(1) (Please see U.S. Government Charging paper as Exhibit #1). The charge based upon the following allegations:

Defendant Wen Yi Wang, "willfully intimidated, coerced, threatened, and harassed a foreign official, Jintao Hu, the President of the People's Republic of China" seen in the following action committed by the Defendant:

> A. Defendant was found to allegedly yell at President Hu in a loud voice in excess of two minutes", attempting to convey oral message as "stop oppressing Falun Gong;" "Your time is running out!" "President Bush, stop him from killing!";
>
> B. Waving a yellow banner with the letters "Falun Dafa is good!" in the direction of President Hu";
>
> C. A cameraman (from CCTV---added by this Amici based upon information from Defendant.) standing near Ms. Wang pulled the banner from her hands and tried to quiet her by placing his hands to her mouth.

First of all, if this nation of constitutional democracy were not momentarily insane, it would not deem such a message of general goods as offensive or as harassing. The above-referenced charge followed with criminal prosecution should be wrapped up with a prompt, hopefully, rather than deferred finality for the following foremost reasons, among other things:

1. The above-referenced charge and on-going criminal prosecution thereupon are unconstitutional for its entirety on its very surface. The criminal prosecution concerning the Defendant's picket-type oral protesting has violated the Defendant's constitutional rights under the First Amendment;

2. The above-referenced charge and on-going criminal prosecution thereupon have also violated 18USC112(d); which prohibits using the remaining 18USC112(b) to abridge an exercise of freedom of speech under 1st Amendment;

3. The above-referenced charge and on-going criminal prosecution thereupon have been in conflict of the legislative intent in its top-priority concern on preserving the integrity of our Constitution, more specifically, the constitutional rights of free speech under 1st Amendment, while in balancing the other significant government interests. Defendant's action on April 20,

2

2006 *precisely mirrored* what had been codified by the Congress at the first place as integral part of old 18USC112, in 1972 version, namely, the "picketing clause". The Congress of the United States repealed the clause's "picketing clause" later in 1976, apparently for concern on the clause's negative impact on 1st Amendment.    It may be unwise, hopefully impossible, to use this instant case to revive the stone-dead "picketing clause" of old-version 18USC112;

4.     The above-referenced charge and on-going criminal prosecution thereupon have violated the purpose, principles, spirit and its coherence of 1998 U.S. International Religious Freedom Act.   Under Sec. 401(b)(1), the President shall identify specific countries that the Commission on International Religious Freedom designates as having obstructed religious freedom.  Reference should be made that the 2005 Country Report of Human Rights Practice published by the U.S. Department of State has presented well documented human rights abuse concerning the PRC government's religious persecution from persecuting house church goers, Bible distributors, massive extra-judiciary detention of Falun Gong practitioners, to "killing of a few thousand" Falun Gong adherents by torture.  It may have triggered the Section 402, and particularly Section 405 of the Act. The president must then *choose* from remedies outlined in Sec. 405 of the Act with fifteen options to exercise against countries engaging in religious persecution. *These include a private or a public demarche; a private or public condemnation*; the delay or cancellation of scientific or cultural exchanges; *the denial, delay, or cancellation of working, official or state visits*; the withdrawing, limitation, or suspension of some forms of US aid; direction to public and private international institutions to deny assistance; and sanctions prohibiting the US government from entering into import or export agreements with the designated governments*.  Now, let's immagine, should have the "public condemnation" under Section 405 been taken, not by Dr. Wenyi Wang, but by our  President George W. Bush on April 20, 2006, by strictly doing what the 1998 congressional Enactment requires him to do, should our President then stand where Defendant Dr. Wenyi Wang is standing today, as a criminal defendant here?  In reality, we did not see our President stand in the position of where Dr. Wenyi Wang is now standing, simply because our President has flatly done nothing specified in 1998 International Religious Freedom Act?  Continuing this trial of persecuting Dr. Wenyi Wang simply appears illogical, and unfortunately, ridiculous.

5.     Moreover, special attention should be raised that Title V of the U.S. International Religious Freedom Act *seeks to promote religious freedom abroad through the way of international media*, exchanges and foreign service awards for working to promote human rights.  According to the Act, an international media is honored and entrusted to shoulder its share of such legitimate missions as to "promote religious freedom", help end religious persecution. Defendant Dr. Wenyi Wang, an active member of media, honestly, sincerely, and peacefully, did what the 1998 Act entrusts her to do  by

3

exercising her rights of expression under the 1st Amendment. In this light, it is then clear who has violated the law? Who has been law abiding?

6.  Assuming the "Faher" of the Third Reich could be defined as "foreign officials" under 18USC 112, could the Chanceller of the German National Socialist Workers' Party which is busy with running gas chambers through out its occupied territories may also be defined as an protected foreign dignatory under 18USC 112, rather than the subjects being subject to "expulsion" under Section 212 of our Immigration and Nationality Act? Mr. Hu Jintao is, among others, the head (Secretary General) of the Chinese Communist Party, a ruling totalitarian political organization under Section 212 of the INA. Whether Mr. Hu Jintao is a qualified, legitimate "foreign dignatory" under 18USC112 may be an open question. The CCP's more innovative development of massive killing by harvesting, trading of human organs (certified in 2005 Human rights Country Report by USDOS published March 18, 2006) in comparison to its Nazi equivalent may not be the solid ground for immunity under Section 212 of INA.

7.  The charging documents involve such fatal flaw as to complete absence of the key witness testimony, the alleged victim's testimony, as to whether he was actually impacted, no matter how slight, by the Defendant's orally conveyed "intimidating" words; If there were such affirmative testimony, then, what was the ultimate source of "intimidation, coercion, threats or harassment" leading to "obstruct" of his performance of official duties? Defendant's "speech", or CCTV guy's self-help violence on the scene? To answer this question, the alleged victim, Secretary General Hu Jintao's own testimony is critical. Further, such a key witness for testimonial purpose, together with such key evidence as of medical/psychological evaluation and diagnosis to determine whether the alleged "victim" was impacted or the degree of harm should be subpoenaed for court proceedings. As to all these critical issues, the mere government's self-serving speculative interpretation of the facts bears none, or little, probative value.

8.  A continuing prosecution of this case may further harm this nation's founding value as a common heritage of this great nation, and as of all mankind.

Raising up to, or in another word, sinking down to, the level of criminal justice concerning the on going criminal prosecution, this instant case may be the first one in its kind to test the quality of the constitutional implication of the related legislative enactment, unfortunately, it may not be the best one to enhance the underlying purpose of the legislation of the 18 USC 112(b).

4

Assuming the prosecutor's charging documents, based upon Officer Stafford's second amended affidavit, are factually precise, what Dr. Wenyi Wang's alleged criminal offense, to say the most, is to ***display a flag, banner, sign***, placard, or device, or ***utters any word, phrase, sound, or noise***, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties."

If that is what the prosecutor means to prosecute, Dr. Wenyi Wang should then be declared innocent. This instant case should be summarily terminated by prejudice, because, continuing prosecuting of this case will encounter an impassible barrier of legal impossibility. The reason is simple, According to USDOJ's charging documents, the entire cause of action was legally based upon a part of the U.s. Congressional Enactment which has long been ***repealed***, period.

> Reading 1972 old statute of 18 USC 112(b), there is the following paragraph: "parades, pickets, ***displays any flag, banner, sign***, placard, or device, or ***utters any word, phrase, sound, or noise***, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties." (emphasis added) Act for Protection of Foreign Official Guests of the United States, Pub. L. 92-539, Title III, 301(c)(1), 86 Stat. 1070, 1073 (1972).
>
> ***The above-cited section was repealed by the Congress of the United States in 1976, period.***

INTERESTS OF THIS AMICCUS

This undersigned Amicus has been a human rights campaigner, fighting for freedom and human dignity against the world's worst totalitarian dictatorship, namely, the dictatorship of proletariat under the rule of Chinese Communist Party (CCP) since his childhood in China decades ago.  He has been continuously a bilingual free lance commentator, advocating this nation's founding value of freedom, democracy and human rights to tens of millions of listeners,  serving for various media in both Chinese and English language for quite a few years.  In this sense, his roll has naturally turned him into a bridging messenger between free nations living in this hemisphere and the enslaved people behind the Great Wall of Iron Curtain.  In June 1999, under the auspices of him

5

and his colleagues, with the blessing from people on Capitol Hill, the Free China Movement celebrated its inauguration in Cannon Building of U.S. Congress after its three-day conference. The mission of Free China Movement is to democratize the totalitarian China into a nuclear-free, peaceful, free nation of lasting democracy through peaceful means. The Foundation is an integral part of the Movement.

Though Falun Gong movement is not an officially part of Free China Movement, however, the heroic mission of the Falun Gong movement in its successful campaign opposing the totalitarian repression has greatly inspired the entire opposition movement. As the world watches, what those heroic brothers and sisters of Falun Gong practitioners are today peacefully fighting, are for the common goods of the 1.2 billion enslaved Chinese Peoples, as well as for the common goods of all free mankind, given to the fact that communist China has twice caused the greatest human casualties to this great nation since WWII, in both Korea and Vietnam. My colleagues and I have seen the share value and shared mission. If Dr. Wenyi Wang were convicted for her peaceful speech, an symbolic action, attempting to raise the previously silent world's awareness to the on-going human rights abuse committed under CCP's hammer and sickle banner in China, while she has successfully achieved this purpose, the chilling message radiated from this Honorable Court House would have rendered a cripple blow to the entire political opposition movement. Therefore, this Amicus is completely detached from the penal interests of this case in monetary term, however, the interests of him and his colleagues in the same ranks of human rights campaigning is inter-related, therefore, he has the great stake concerning the outcome of this case, which qualifies him to be the amicus participating in this proceedings, if this Honorable Court finds the Brief of his legal Opinion rather helps the Court, qualifying him to be the true friend to this Honorable Court, as well as to the justice systems of this great nation.

PRELIMINARY PRESENTATION OF FACTUAL/EVIDENTIARY ISSUES

Carefully watching what is going on in this Honorable Court house concerning the above-captioned case, the undersigned Amicus, humbly raises the following factual issues arising out of the on-going legal controversy.

6

It may not be difficult to find that Defendant Dr. Wenyi Wang, a practitioner of Falun Gong meditation, is a law abiding, well educated, morally integrated individual. On April 20, 2006, when the Administration was holing the welcoming ceremony in the Rose Garden of the White House in honor of Mr. Hu Jintao, the Secretary General of the Chinese Communist Party, visiting Washington, DC, the United States from Beijing, the "People's Republic", Dr. Wang was standing among hundreds of the correspondents, journalists, among all these personnel from the worldwide media, as a licensee, instead of trespasser.

According to the charging paper prepared by the prosecutor, Defendant Dr. Wang's Federal Offense is no more than orally "yelled *at*" Mr. Hu Jintao, the Secretary General of the Chinese Communist Party, from where she was standing among the press crews, whose direct distance is believed to be at least 200 feet away from the "foreign official" who was allegedly "yelled *at*", when the latter, behaving like many of his Party comrades, was reading his speech script to the world media. According to the prosecutor's charging paper, and other source of information, it seems that:

1. Defendant Dr. Wang made an emotional utterance *approximately* at the direction of Mr. Hu, the alleged "foreign official", attempting to convey an out-crying message petitioning for immediate halt of bloody persecution against her fellow Falun Gong practitioners in communist China, particularly a halt of a widely believed dreadful torture by snatching human organs targeting her fellow Falun Gong adherents inside Communist ruled China Mainland in the name of "People's Republic".

2. There is no evidence, no allegation that Defendant had committed any physical action other than mere vocal utterance, neither there is any allegation that the Defendant had ever moved her physical position, except by allegedly stretching a cloth-made Falun Gong's banner, a kind of "speech" we just saw what the heroic, courageous Congresswoman, the Honorable Nancy Poloicy did in front of the portrait of "Chairman Mao" at Tian An Men Square of Beijing, the "People's Republic" in June 1990. (The Congresswoman with her equally courageous colleagues were also rudely subdued and arrested by the plainclothes, and the

7

armed police of Beijing, then.  However, the "People's Procutorator of the PRC did not go that far by officially prosecuting them.)

3.  It appears that Mr. Hu's reading of his speech script was very briefly interrupted. Though the charging paper alleged that the Defendant's oral protest last for more than two minutes, there is no showing that the person who was allegedly "yelled *at*" was negatively affected during such time zone.  Therefore, it may be extremely difficult for the prosecutor to show that the alleged "victim" in this show case of criminal prosecution, had ever been *directly* impacted by the Defendant's oral utterance, her "speech".

4.  Defendant's apparently impromptu oral utterance had apparently had considerable impact at large at certain time, and certain place.  According to the information the undersigned received, when Defendant made the oral protest, allegedly "yelling at" the Secretary General, all camera from the journalists world over surrounding the Defendant, instinctively and quickly shifted their focal point from the Secretary General's speech to this ordinary woman, having made this plain, weak, virtually invisible figure the center of focal attention by the world media.

5.  There is no showing, no allegation that the actually, and directly "impacted", particularly to say, the domestic and international mainstream media, the press crew, is what 18USC 112(b) intended to protected "victim", namely, the "foreign officials", neither is there any showing that these journalists persons were either intimidated, threatened, coerced, harassed, or their performance of work were interfered by their colleague's uninvited, probably untimely utterance of mostly humanitarian message.

6.  It appears there might be, to say the most, a slightest, very brief extraction of Secretary General's attention after Defendant made her oral remarks, the press crew shifted their camera focus, and physical altercation occurred between the Defendant and the assailant from CCTV who tried to subdue Dr. Wang by physical force.  However, there is no showing, no allegation that such a brief extraction of the speaker's attention was either caused by the press crew's sudden change of their focal aiming, or by the CCTV guy's self-help, forciful enforcement of "justice" against the Defendant.  Whether there was such an

8

impact, which one is the ultimate source of such an impact, or the depth and extent of such an impact is a critical issue concerning whether such a criminally prosecuted matter is actionable. To answer this critical question, the alleged "victim's" testimony under cross-examination is absolutely needed, yet it has been missing here. Here, the Department of Justice seems to have simply brought this criminal case merely based upon its own speculation.

7. The Prosecutor's job here has further impassable legal obstacle: What specified under the 18USC112(b) is a specific intent crime. For apparent reason, the law has not only requires the showing that the alleged perpetrator has not only committed an act of intimidation and so on, but also to proven that the perpetrator's subjective intent to commit such an intimidation for purposefully targeting the foreign official. The government's speculatively alleged "yelling at Hu" does not prove the actor's subjective intent. The aftermath information provided by the Defendant reasonably shows the state of mind of the Defendant: calling for stop of such conscious shocking dreadful torture as snatching human organs from the persecuted for the booming dirty bloody trading. If that is the Defendant's state of mind which prompts the Defendant to yell for "stop" when she saw Mr. Hu, an icon of the Chinese Communist Party, her yelling was apparently not "shooting" "at" any person on the scene. It is clear to the Defendant, that Hu is not the actual person who insert his ten bloody fingers into the body of her fallen fellow Falun Gong practitioners. Hu does not have to do it by himself on his official statue within the Chinese Communist Party ranks. Then who is so doing and subsequently criticized by Defendant: collectively the Chinese Communist Party, a legally totalitarian political organization under Section 212 of U.S. Immigration and Nationality Act. Therefore, Defendant may not have *"willfully"* yelled *at* Hu, but *"willfully"* yelled *at* the Chinese Communist Party, the collective term which does not fall into the protection of 18USC 112.

8. While the Chinese Communist Party at whom this Defendant was yelling, the term of collective body of totalitarian organization, though under the leadership of Hu, is not the subject to which our Congressional Enactment as 18 USC 112

9

intends to extend its protection. Instead, it is the subject under the

U.S. Immigration and Nationality Act, through which the Congress intends to

***expel.*** If this is the case, then, this criminal prosecution is completely mis-

palced, mis-aimed, and mis-fired.

ARGUMENT ON LEGAL ISSUES

Defendant Dr. Wang was charged for criminal offense under 18 USC 112(b)(1),

which provides as follows:

(b) Whoever willfully -

(1) intimidates, coerces, threatens, or harasses a foreign
official or an official guest or obstructs a foreign official in
the performance of his duties;

Due to lack of precedents of criminal prosecution in this particular arena, it

remains unclear whether the alleged perpetrator's "speech" alone, in absence of such

other covert acts as gesture of violent physical attack, pull off the loud speaker, verbal

distortion to cause the earful victim's immediate fear, or cause immediate public

disturbance, could constitute such offense. However, want of showing such an orally

conveyed message to become contents-audible *at* the allegedly targeted person under the

particular protection of the Federal Statute may still be necessary. The two most related

cases: *Boos v. Barry*, 485 U.S. 312 (1988), and CISPES v. FBI 770 F2d 468, may be

distinguishable because neither is related to criminal prosecution of any alleged

perpetrators. Instead, petitioners in those cases raised preemptive legal actions seeking to

invalidate 18 USC 112(b) and a related DC Ordinance. However, the deliberation and

analysis of relevant legal/consitutional issues presented by Justice O'Connor of the

Supreme Court of the United States in *Boos v. Barry* may give insightful guideline in

interpreting the issues presented in this instant case.

A mere verbal abuse beyond reach of the targeted is by no means of intimidation,

coercion, threats or harassment. One who falls into the victim under "intimidation,

coercion, threats, or harassment" is because such intimidation, coercion, threats, or

harassment have clearly had physical or psychological impact upon him/her, the alleged

10

victim. A showing of the alleged victim's own testimony of his/her physical or

psychological trauma as consequences of such impact from the alleged perpetrator's **acts of** intimidation, coercion, threats, or harassment.

Then the immediate question is who was intimidated, coerced, threatend, or harassed? The Prosecutors argued that Hu was intimidated, coerced, threatend, or harassed. How did the prosecutors know Hu was intimidated, coerced, threatend, or harassed? Have the prosecutors ever questioned Mr. Hu and obtained such key witness' testimony? A mere official's speculation that Hu was intimidated, coerced, threatend, or harassed cannot sufficiently establish their cause of action. A mere testimony from the alleged "victim" without corroboration may also not be sufficient to establish the case. In absence of critical evidence of such "impact upon the victim", the Defendant's oral protest, a typical verbal act of "speech" can, to say the most, only be qualified to be an "attempt to intimidate, coerce, threaten, or harass", that falls into the Federal Offense under 18 USC 112(b)(2), instead of b(1). However, this is not what the Department of Justice chooses to prosecute.

The preliminary issues here may be The prosecutor in this instant case would have extremely difficult obstacles to prove the ever-existence of any direct impact from Dr. Wenyi Wang upon Secretary General Hu Jintao. Such a weakness may have been fixed by Mr. Hu's own testimonial witness under cross examination with corroboration of other evidence In absence of such showing, the on-going prosecution shall inevitably fail for fatal failure in meeting its burden of proof. I feel really amazed how could the Prosecution be even able to pass the preliminary "probable cause" scrutiny under the Honorable Deborah Robinson who usually would tend to kick such a poorly prepared case out at the first place!

Whether the Secretary General of Chinese Communist Party is qualified to be a protected "foreign officer" is an open question. In addition to Section 212 of the Immigration and Nationality Act, several other Federal enactments also prohibit an entry of such "foreign officials" belonging to a totalitarian or fascist organizations. If those statutes were seriously enforced, we may not have this instant case at the first place. In

11

Case 1:06-cv-00182-DAR Document 11 Filed 04/23/2007 Page 22 of 29

Title IV details the possible options available to the president and his actions based upon them in response to the states which violate the provisions under the Act. Under Sec. 401(b)(1), the President shall identify specific countries that the Commission on International Religious Freedom designates as having obstructed religious freedom. The president must then, with the consultation of the secretary of state, the ambassador at large, the National Security Council special advisor, and the commission, design a response to those countries. Countries that are severe violaters of religious freedom are categorized under Sec 402 of the Act and this subjects them to punitive sanctions which are listed in Sec. 405. Under this section, the president *must* either enter into a binding agreement with the concerned country to end the religious persecution, or to *choose* from remedies outlined in Sec. 405 of the Act. This section offers the president with fifteen options to exercise against countries engaging in religious persecution. These include a private or a public demarche; a private or public condemnation; the delay or cancellation of scientific or cultural exchanges; *the denial, delay, or cancellation of working, official or state visits*; the withdrawing, limitation, or suspension of some forms of US aid; direction to public and private international institutions to deny assistance; and sanctions prohibiting the US government from entering into import or export agreements with the designated governments. (Though, the same Act, Under Title IV, allows the president to waiver punitive measures against the concerned country. This would allow the president in balancing of the objectives of the bill with other US Foreign Policy interests.)

Special attention should be raised that Title V of the U.S. International Religious Freedom Act *seeks to promote religious freedom abroad through the way of international media*, exchanges and foreign service awards for working to promote human rights. The Immigration and Naturalization Service officials are trained under the venues of Title VI of the Act. The final provision of the Act, Title VII contains miscelleneous provisions, including 701, which urges transnational corporations to adopt codes of conduct sensitive to the right to freedom of religion.

What Defendant Dr. Wenyi Wang have done is fully accorded with the

principles and the essense of what is provided in Title V of the U.S. International

Religious Freedom Act. Assuming we are not doing the content-neutral analysis of this

instant case, what we are shown in the deep nature of this case is that there is not even a

single justification to accuse Dr. Wang and her employer's act to utter their verbal protest

to on-going religious persecution inside communist China under Hu's party's ruling,

there may be thousands of reasons to condemn the inaction/omission of this

Administration vis-a-vis all esclating massive persecution against Falun Gong followers

inside communist China, given to the fact that the U.S. Department of State has clearly

certified, by its 2005 Human rights Practice Country Report, before the White House,

before the U.S. Congress that such religious persecution against Falun Gong

practitioners has reached such height that "thousands" of Falun Gong practitioners have

been killed in torture.

The Government's decision to launch such a possibly unprecedented criminal

charge against Dr. Wenyi Wang is on its surface a reckless misjudgment, and legally, *it is*

*unconstitutional*. The failure on the prosecutor's side is not simply limited to technical,

evidentiary issues, this is showcasing a complete failure in bringing the constitutional

issues before this Honorable U.S. constitutional court. At first place, a particular caution

should be given when such a criminal prosecution is raised to target the freedom of

expression raised by an invited press crew member when 1st Amendment issues

apparently blinks its red light. It has become an integral part of American founding value

to respect the media as a watch dog, even a "fourth branch". Most importantly, the

Congress of the United States later increased a constitutional guardian in the process to

enforce such a Federal Statute, demonstrating the Congressional concern on the

Government's abusive application of this statute to suppress the constitutionally protected

speech rights:

As a balancing clause, 18 USC 112(d) provides:

"Nothing contained in this section shall be construed or applied so as to abridge
the exercise of rights guaranteed under the first amendment to the Constitution of
the United States."

13

The legislative intent expressed in 18 USC 112(d) is conspicuous, and free of ambiguity: Words alone, even targeting the protected category of foreign dignitaries, are constitutionally protected from criminal prosecution under 18 USC 112(b).  If there has been not yet precedents to test such a balancing mechanism, then, this instant case may provide the best opportunity to create such a precedent.

The reason to have a parallel mechanism is that the Government of the United States has to balance the both government vital interests, between which the Constitution is given the priority concern.

Its legislative history reveals that 18 USC 112 was developed as a deliberate effort to implement our international obligations. See, e. g., 118 Cong. Rec. 27112-27113 (1972). At the same time, the history reflects a substantial concern with the effect of any such legislation on First Amendment freedoms. For example, the original provision, when passed in 1972, contained a prohibition on willful acts or attempts to "intimidate, coerce, threaten, or harass . . . or obstruct a foreign official," as does the current version of 112. In a portion it also punished anyone who:

> "parades, pickets, *displays any flag, banner, sign*, placard, or device, or *utters any word, phrase, sound, or noise*, for the purpose of intimidating, coercing, threatening, or harassing any foreign official or obstructing him in the performance of his duties." (emphasis added) Act for Protection of Foreign Official Guests of the United States, Pub. L. 92-539, Title III, 301(c)(1), 86 Stat. 1070, 1073 (1972). (this section was *repealed* by the Congress in 1976)

Concerned with the effects that such a provision might have on First Amendment freedoms, the Senate added a new subsection, which directed:

> "[N]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States." 301(e), 86 Stat. 1073. See S. Rep. No. 92-1105, p. 19 (1972).

After the 1972 passage of 112 in this form, congressional concerns about its impact on First Amendment freedoms apparently escalated rather than abated. In 1976, Congress revisited the area and repealed the antipicketing provision, leaving in place only

14

the current prohibition on willful acts or attempts to intimidate, coerce, threaten or
harass a foreign [485 U.S. 312, 326] official." 112(b)(2). In modifying 112, Congress was
Case 1:06-mj-00182-DAR Document 11 to Filed 04/23/2007 Page 25 of 29

motivated by First Amendment concerns:

> "This language [of the original anti-picketing provision] raises serious
> Constitutional questions because it appears to include within its purview conduct
> and speech protected by the First Amendment." S. Rep. No. 94-1273, p. 8, n. 9
> (1976); H. R. Rep. No. 94-1614, p. 6, n. 9 (1976).

The concern of its international treaty obligation to protect the foreign dignitaries
are the important government interests, however, it is also clear that such a protection
does not have to be so over-stretching to invade the arena of the constitutionally protected
rights of speech, such as what Defendant Wang did on April 20, 2006. Such a delicate
balance does not have to be broken simply because the protected foreign dignitary today
is such type of totalitarian dictators as brother Fidel Castro, King Jong Il, Joseph Stalin,
or Pol Pot. The history shows that both the Congress and the Supreme Court has
consistently rejected to yield its concern on constitutional guarantee of rights to the
accommodation or patronization to the foreign dictators' bad taste, or personal preference
to enjoyment of zero protest. The legislative intent of the enactment of 18 USA 112(b)
cannot be construed to an endorsement from the government of the United States to
endorse, accommodate, patronize an extra-territorial exercise of proletarian dictatorship
of Communist "People's Republic" at the cost of our nation's traditional guarantee of
free speech under the first amendment.

It has been well established that "no agreement with a foreign nation can confer
power on the Congress, or on any other branch of Government, which is free from the
restraints of the Constitution." Reid v. Covert, 354 U.S. 1, 16 (1957). See 1 Restatement
of Foreign Relations Law of the United States 131, Comment a, p. 53 (Tent. Draft No. 6,
Apr. 12, 1985) ("[R]ules of international law and provisions of international agreements
of the United States are subject to the Bill of Rights and other prohibitions, restrictions or
requirements of the Constitution and cannot be given effect in violation of them").

> "Thus, the fact that an interest is recognized in international law does not
> automatically render that interest "compelling" for purposes of First Amendment

analysis. We need not decide today whether, or to what extent, the dictates of
international law could ever require that First Amendment analysis be adjusted to
accommodate the interests of foreign officials." *Boos v. Barry*, 485 U.S. 312
(1988) See, e. g., citing Perry Education Assn., 460 U.S., at 45 ; Board of Airport
Comm'rs of Los Angeles, 482 U.S., at 573 .

In balancing both the compelling government interests in protecting the foreign
dignitaries and protecting the citizens' rights under the First Amendment, while placing
the latter on the better priority is the founding value of common heritage of this nation.
To better demonstrate such jurisprudential root, we have to revisit the enriched legal
culture of the related constitutional cases by the U.S. Supreme Court, particularly, the
Sullivan v. New York Times:

> "The general proposition that freedom of expression upon public questions is
> secured by the First Amendment has long been settled by our decisions. The
> constitutional safeguard, we have said, "was fashioned to assure unfettered
> interchange of ideas for the bringing about of political and social changes desired
> by the people." Roth v. United States, 354 U.S. 476, 484 . "The maintenance of
> the opportunity for free political discussion to the end that government may be
> responsive to the will of the people and that changes may be obtained by lawful
> means, an opportunity essential to the security of the Republic, is a fundamental
> principle of our constitutional system." Stromberg v. California, 283 U.S. 359,
> 369 . "[I]t is a prized American privilege to speak one's mind, although not always
> with perfect good taste, on all public institutions," Bridges v. California, 314 U.S.
> 252, 270 , and this opportunity is to be afforded for "vigorous advocacy" no less
> than "abstract discussion." N. A. A. C. P. v. Button, 371 U.S. 415, 429 . [376 U.S.
> 254, 270]  The First Amendment, said Judge Learned Hand, "presupposes that right
> conclusions are more likely to be gathered out of a multitude of tongues, than
> through any kind of authoritative selection. To many this is, and always will be,
> folly; but we have staked upon it our all." United States v. Associated Press, 52 F.
> Supp. 362, 372 (D.C. S. D. N. Y. 1943).

The constitutional safeguard of freedom of expression is an integral part of the
founding values of this constitutional democracy as deliberated by then Justice Brandeis
of the U.s. Supreme Court:

> "Those who won our independence believed . . . that public discussion is a
> political duty; and that this should be a fundamental principle of the American
> government. They recognized the risks to which all human institutions are
> subject. But they knew that order cannot be secured merely through fear of
> punishment for its infraction; that it is hazardous to discourage thought, hope and
> imagination; that fear breeds repression; that repression breeds hate; that hate
> menaces stable government; that the path of safety lies in the opportunity to

16

discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law - the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375 -376

Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. See Terminiello v. Chicago, 337 U.S. 1, 4 ; De Jonge v. Oregon, 299 U.S. 353 , [376 U.S. 254, 271] 365. The present advertisement, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent.

The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." N. A. A. C. P. v. Button, 371 U.S. 415, 445 . As Madison said, "*Some degree of abuse is inseparable from the proper use of every thing*; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution (1876), p. 571. While the freedoms of expression [376 U.S. 254, 272] are to have the "breathing space" that they "need . . . to survive," N. A. A. C. P. v. Button, 371 U.S. 415, 433

With all these highlighted constitutional precedents in mind, it is clear that the government of the United States does not have to deviate from its founding value just to accommodate, patronize, and kow tow to one or two infamous totalitarian dictators' personal preference in enjoyment of total silence of protesting noise in their own territories of Gulag.   "We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these (First Amendment—added) principles here." U.S. Supreme Court, BOOS v. BARRY, 485 U.S. 312 (1988) **485 U.S. 312**

17

# Conclusion

For the foregoing reasons, this Amicus humbly moves that this Honorable Court takes an appropriate summary action to facilitate a proper final disposition of this instant case while taking a bit reference, if any, to the opinions expressed in this amended briefing. Again, this Amicus reiterates his support for the prosecutor's efforts hopefully leading to a decent end of this instant case in the most harmonious way without further harming the Defendant, because he believes that the fundamental interests embedded in freedom, democracy and human rights between the human rights campaigners, and the Government of the United States, presumably the world's ultimate guardian of freedom, are the same.

Finally, this Amicus respectfully prays that should this instant case cannot be settled during its pretrial period, a Trial by Jury may be humbly prayed. This Amicus further prays that this Honorable Court gives particular reasons if it chooses to deny the foregoing Amicus Curiae.

Respectfully submitted,

Ning Ye,  Amiccus

18

Certificate of Service

COPY of the foregoing MAILED by first class mail, postage prepaid to the following addressees on this 22nd day of May, 2006 to:

Michael T. Truscott, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
District of Columbia
Judiciary Center
555 Fourth Street, NW
Washington, DC 20001

David Bos, Esq.
Federal Public Defender
625 Indiana Ave., NW
Suite 505
Washington, DC 20004

By:    _____
          Ning Ye, Amiccus.

19